UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION


| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | Case No. 4:06CR00222 HEA (AGF) |
| COURTNEY BUIE, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This matter is before the Court on the pretrial motion filed by Defendant, Courtney

Buie.  Pretrial matters were referred to the undersigned United States Magistrate Judge

under 28 U.S.C. § 636(b).  Defendant filed a motion to suppress evidence and statements.

(Doc. No. 21).  An evidentiary hearing was held on May 15, 2006.  The government was

represented by Assistant United States Attorney Allison H. Behrens.  The Defendant was

present and represented by his attorney, Assistant Federal Public Defender Caterina M.

DiTraglia.

At the hearing, the government presented the testimony of Detective Thomas

Kitchell, who has been employed with the St. Louis Metropolitan Police Department

(SLMPD) for approximately ten years and has been assigned to the narcotics division for

approximately six years.  Defendant issued a subpoena to Ms. Sheila Williams to testify.

Inasmuch as defense counsel had advised the Court of the subpoena and that Ms.

Williams' testimony could possibly subject her to criminal prosecution, the Court appointed counsel, Steven V. Stenger, to represent Ms. Williams in advance of the hearing.  Ms. Williams took the stand and confirmed her decision to invoke her Fifth Amendment right and refused to testify regarding the events of March 6, 2006.  Over the initial objection of the government,[1] Defendant thereafter presented the testimony of Thomas Hinton, who has been an investigator with the Federal Public Defender for almost 22 years, who testified as to statements Ms. Williams made to Mr. Hinton during the course of his investigation of the events, which testimony the Court has considered. At Defendant's request, the Court also considered the testimony of Det. Michael Ehnes at the preliminary hearing held before the undersigned on March 6, 2006.  Det. Ehnes has been employed with SLMPD for eight years and assigned to narcotics for two years.  The parties were given leave to file post-hearing memoranda, after which the matter was taken under submission.

Based on the testimony and evidence adduced and having had an opportunity to observe the demeanor and evaluate the credibility of the witnesses, the undersigned makes the following findings of fact and conclusions of law.

---

[1]  The government withdrew its objection in its post-hearing memorandum and now concedes that the Court may consider Mr. Hinton's testimony regarding Ms. Williams' statements for purposes of the suppression hearing.  The government also withdrew its objection to consideration of the testimony of Det. Michael Ehnes offered at the preliminary hearing.

## FINDINGS OF FACT

On March 6, 2006, Det. Kitchell received a call from a confidential informant (the "CI") advising him that he/she knew someone selling narcotics in the 5200-5300 block of Arlington, in the City of St. Louis. Det. Kitchell knew and had dealt with the CI previously, and he/she had proven reliable in the past. The CI provided a description of both the individual and the maroon vehicle that he drove.

Based on this information, Det. Kitchell and his partner, Det. Ehnes, drove with the CI to the 5200 block of Arlington, arriving shortly before 3:00 p.m. They were driving an unmarked minivan, and both officers were wearing raid jackets that clearly identified them as police on the front and back. This portion of Arlington is a one-way street, divided by Thekla at the intersection between 5200 and 5300 Arlington. They did not see anyone in the 5200 block, and proceeded to the 5300 block where they observed Defendant standing in the street. His vehicle, a maroon Cadillac, was parked on the left side of the one-way street, just past the intersection of Arlington and Thekla, perhaps 20'-30' from the corner. Defendant was standing next to a car that was parked on the right-hand side of the street and appeared to be talking to the person inside. Both the Defendant and his vehicle matched the description that the CI had previously given to Det. Kitchell, and the CI identified both Defendant and the car to the detectives. Def. Ex. A is a photograph of the 5300 block of Arlington, viewed from the 5200 block. The "X" on the photograph shows approximately where Defendant's maroon Cadillac was parked. The car near where Defendant was standing when they drove up was parked at

about the same location as the blue car that appears in the photograph.

The officers continued down the street and let the CI out of their car a few blocks away. They then circled back and set up surveillance in the 5200 block of Arlington, approximately halfway up the block, using binoculars to observe the scene. They observed an older model Buick Regal enter the intersection from Thekla and turn right onto Arlington. The Buick Regal stopped in the middle of the street, and Defendant Buie approached the passenger side of the car and had a brief conversation with the occupant. The officers observed Defendant take something out of his pocket and hand it to the occupant of the car, but they were unable to see what was in his hand. Defendant was then given what appeared to be currency, which he put in his pant pocket. The Buick Regal then continued down the street and drove off. Based on his training and experience, Det. Kitchell believed he had observed a hand-to-hand drug transaction, and the detectives decided to approach to investigate the matter further.

As the officers began to pull behind the Defendant's maroon car, Defendant was walking back across the street to the parked car on the right-hand side of the street. As the officers got out of their van, they announced "police." Defendant saw the officers, turned, and began walking back toward his own car. When he was approximately 3'-4' from his car, he reached into his left pant pocket and tossed something toward the open passenger window of his car in a quick motion. Some of what Defendant tossed went into the car, and some hit the door and fell to the ground. Det. Ehnis detained Defendant Buie while Det. Kitchell retrieved the objects from the ground. On the ground, he found

two plastic baggies or packages that appeared to contain crack cocaine.

Defendant's girlfriend, Sheila Williams, was sitting in the passenger seat of Defendant's maroon car. The officers instructed her to get out of the car, she complied, and they escorted her to the back of the vehicle. They placed Defendant under arrest for possession of a controlled substance and performed a protective frisk, but did not locate any contraband or weapons. Defendant stated something to the effect of, "You can't put that shit on me."

Det. Kitchell advised Defendant of his Miranda rights from memory. At the hearing, he recited the rights of which he advised Defendant. He advised him: "You have the right to remain silent. Anything said can and will be used against you in a court of law. You have the right to have an attorney to be present before any questioning. If you cannot afford an attorney one will presented to [you] at no cost." Defendant indicated that he understood his rights. He then stated he could not afford to go back to the penitentiary where he had spent ten years. At the time, Defendant did not appear to be under the influence of drugs or narcotics, or suffering from any mental infirmity. There was nothing about Defendant's manner to suggest that he did not understand what was being said to him. No threats or promises were made to induce Defendant's statements.

The detectives placed Defendant in their vehicle, and Det. Ehnis searched the maroon Cadillac, but did not find anything. Det. Ehnis advised Ms. Williams of her rights under Miranda and asked her if she had any knowledge of what Defendant threw

into the car. Ms. Williams initially said no. Det. Ehnes said they could arrange for a female to search her, and she then removed a baggie with crack cocaine from her person, after which she was placed under arrest. Ms. Williams advised the detectives that Defendant was her boyfriend, and that he might be the father of her child. She stated that they lived together at 3748 Itaska, Apt. 7. Det. Kitchell asked whether she would consent to permit them to search the residence, and she said yes. He presented her with a consent to search form and advised her that she did not have to agree to consent. <u>See</u> Govt. Ex. 1. He reviewed the top portion of the form and filled in the address after she confirmed it. He then reviewed the remainder of the form with her, and she signed the form at 3:15 p.m. At the time she provided her consent, Ms. Williams did not appear to be under the influence of drugs or alcohol and did not appear to be suffering from any mental infirmity. The detectives did not have their firearms drawn, and no one made any threats or promises to her to induce her consent to search.

Ms. Williams advised the detectives that she needed to pick her children up, and she asked them not to seize the car. Det. Kitchell spoke to Sergeant Cruz on the phone and got approval to release Ms. Williams on an at-large warrant. They permitted Ms. Williams to drive the maroon Cadillac to the residence, which was approximately 20 minutes away, and the detectives followed behind, with Defendant in their car. They also arranged for other officers to meet them at the residence. As they neared the residence, Defendant said he did not know why they were going to the Itaska residence, because he did not live there.

Officers Singh and Wassel and Sgt. Cruz met the detectives at the residence. The door was locked, and they used a key, which they believed was from Defendant Buie's key ring, to enter. Ms. Williams' brother and her brother's friend were inside the residence. They were taken to the living room, where Ms. Williams and Defendant Buie were also taken.

The officers requested to search the bedroom, which was locked. Ms. Williams advised them that they had lost the key, and that they used a butter knife to open the door. She showed the officers where the butter knife was and instructed them on how to open the door, which they were then able easily to open with the butter knife. Both men's and women's clothing were located in the bedroom. Govt. Exs. 3a-3c. On the dresser there was a picture of Defendant with Ms. Williams, and in between the mattress and box spring they located some paperwork that pertained to Defendant Buie. Govt. Exs. 3d-3f. On top of a dresser there was a box of sandwich baggies; and inside the bottom drawer of the dresser, which contained men's clothing, they found a sock which contained $1,400 in cash and another sock which contained crack cocaine. Govt. Exs. 3g-3j.

The detectives attempted to further interview Defendant, but he did not make any more statements. They took Ms. Williams to a back bedroom to speak to her separately and advised her of the narcotics and money they had located. She responded that she was unaware of those items and said she would not have agreed to let them search if she had been aware of the crack and cash. Ms. Williams agreed to make a written statement. Det. Ehnes presented a written warning and waiver form to her and reviewed it with her.

None of the officers had their firearms drawn at the time, and no threats or promises were made to induce her to make a written statement. She appeared to understand the form. Govt. Ex. 2.

Part I of the form is a Waiver Certificate, in which Ms. Williams acknowledged that Det. Ehnes had advised her that he wanted to question her in connection with violating the Missouri Controlled Substance Law, trafficking in narcotics, of which she was suspected or accused, and that he had advised her of her rights. The form detailed Ms. Williams' rights under Miranda, and she acknowledged that she read and understood those rights, and further acknowledged that she voluntarily waived the rights and desired to make a statement. The waiver portion of the form was signed by Ms. Williams, and her signature was witnessed by both detectives. Id.

In Part II of the form, Ms. Williams wrote in her handwriting that "[I] didn't know that it was drugs in the house. So I did sign a consent form for them to search the house and they said they found crack and cash." The form further states, under her written statement and above her signature, that she read and understood the written statement she had made; that the statement was true; and that she made the statement "freely without hope of reward or benefit, without threat of punishment, and without coercion, unlawful influence, or unlawful inducement." The written statement was separately signed by Ms. Williams, and her signature was witnessed by the two detectives. The time noted on the form was 16:15, or 4:15 p.m. Id. Ms. Williams was then released on an at-large warrant.

The detectives returned to the front room and took Defendant to the South Patrol Station for booking. At the station, Det. Kitchell performed a search of Defendant's person and found a lump in the back of Defendant's pants. He retrieved the item from inside Defendant's pants and discovered it to be additional crack cocaine, which he seized. He also seized $40 from Defendant's front pant pocket, which had been located but not seized during the earlier frisk. Defendant did not make any further statements, and nothing further was seized from him.

Mr. Hinton testified that he spoke to Ms. Williams on the telephone on March 13, 2006, and later spoke to her in person. He testified that she told him that Defendant Buie lived with his sister in the 5300 block of Arlington, but that he stayed with her on Itaska some nights. With regard to the incident on March 6, 2006, he testified that Williams said she was with Defendant at the scene, and that Defendant got out of the car and went across the street to talk to one or two people waiting in a car. She said when his cell phone rang, he walked back to the car to answer the phone and a minivan pulled up and two officers got out and grabbed Defendant. They put him at the rear of the car and searched him. She denied that any other car ever drove up, that any transaction took place with that car, or that Defendant threw anything into the car where she was seated. As recounted by Mr. Hinton, Ms. Williams said that when she got out of the car, the officers asked if she had any drugs, and she said no. When they advised her they would get a female officer to search her, she gave them a "50" of crack cocaine, which she said was hers. When the officers said they wanted to search the residence at Itaska, she told

Mr. Hinton that she advised the officers that Defendant lived on Arlington. They said they wanted to search her home and said she could either consent or they had a team requesting a search warrant. She told Mr. Hinton that she had in fact signed the consent to search form, but that she felt compelled to sign the consent form. She further admitted that she drove to the Itaska residence and the officers followed. Following the search of the residence, she said that she told the detectives that the cash located was hers. She said she thought she was going to be arrested and felt threatened throughout.

In many respects, the hearsay statement of Ms. Williams, offered through Mr. Hinton's testimony, does not differ from the testimony of Dets. Kitchell and Ehnes. To the extent her hearsay statement does differ from that of the officers, the undersigned, having had an opportunity to observe the officers' testimony and demeanor, and having observed the actions and demeanor of Ms. Williams at the hearing,[2] credits the testimony of Dets. Kitchell and Ehnes. Apart from her obvious cause for bias,[3] the Court further notes that some of the comments she made to Mr. Hinton are internally inconsistent, and that her statement is  contrary to her own written statement. That she declined to testify

---

[2] At noted by the government, Ms. Williams was crying at the hearing and appeared distressed that she could not assist Defendant. She apologized to Defendant as she left the courtroom.

[3] Defendant makes much of the fact that Ms. Williams' statements were against her interest, but the undersigned disagrees. While she says she admitted that the crack cocaine she produced at the scene was hers, inasmuch as that crack cocaine had been found on her and hidden by her, she had reason to believe she would be charged with it anyway. She did not admit that the crack cocaine found in the bedroom was hers.

in court regarding the statements she made to Mr. Hinton, and that her testimony was not

subject to cross-examination, also undercuts the reliability of the statements she made to

him, and the Court finds little in this record to corroborate her statements to Mr. Hinton

that conflicted with the other testimony and evidence.  See Federal Rules of Evidence

804(b)(3).

## CONCLUSIONS OF LAW

### A.  <u>Arrest of Defendant</u>

Defendant asserts that the officers lacked probable cause to arrest Defendant Buie.

On these facts, however, it is clear that the detectives had reasonable cause to conduct an

investigatory detention, and that they thereafter obtained probable cause to arrest

Defendant.

Police officers may briefly detain an individual for an investigative purpose when

they have a reasonable belief that "criminal activity may be afoot."  <u>Terry v. Ohio</u>, 392

U.S. 1, 30 (1968); <u>United States v. Bell</u>, 183 F.3d 746, 749 (8th Cir. 1999).  The level of

proof necessary is "considerably less than proof of wrongdoing by a preponderance of the

evidence."  <u>United States v. Sokolow</u>, 490 U.S. 1, 7 (1989).  The reasonable belief

requires suspicion based on "'particularized, objective facts which, taken together with

rational inferences from those facts, reasonably warrant[] suspicion that a crime [is] being

committed.'"  <u>United States v. Beck</u>, 140 F.3d 1129, 1136 (8th Cir. 1998) (quoting

<u>United States v. Martin</u>, 706 F.2d 263, 265 (8th Cir. 1983)).  In assessing the

reasonableness of the suspicion, officers may "draw on their own experience and

specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" United States v. Arvizu, 534 U.S. 266, 273 (2002) (quoting United States v. Cortez, 499 U.S. 411, 418 (1981)).

Here, Det. Kitchell had information from a confidential informant who was known to him and who had provided reliable information in the past. The detectives corroborated that information through their own investigation. They went to the area identified by the informant, and observed an individual standing in the middle of the street who matched the description previously given by the informant, and whose car also matched the description previously given. The informant confirmed that Defendant was the individual who had been selling the crack cocaine, and the detectives thereafter observed Defendant engaging in what appeared to be a hand-to-hand transaction. Though Defendant questions the ability of the officers to have observed such a transaction, the officers were only half a block away and were using binoculars, and therefore were capable of observing such a transaction. This provided ample reasonable suspicion for the stop. United States v. Bustos-Torres, 396 F.3d 935, 942-43 (8th Cir.) (reasonable suspicion for Terry stop where officers, in area known for drug activity, saw individual entering defendant's car after same individual had been seen conducting probable drug transaction with another car a few minutes earlier), cert. denied, 125 S.Ct. 2557 (2005); United States v. Spotts, 275 F.3d 714, 718, 720 (8th Cir. 2002) (reasonable suspicion to stop defendant and ask him to get out of truck where truck had been seen driving by

residence police were searching for methamphetamine lab and the officers had intelligence reports that the defendant dealt methamphetamine); United States v. Gonzalez, 220 F.3d 922, 925 (8th Cir. 2000) (reasonable suspicion of drug transport based on accomplice's information, including particulars of vehicle and direction of travel).

Indeed, on these facts, the officers had probable cause to believe that Defendant had engaged in criminal conduct. Probable cause exists "when at the moment of arrest police have knowledge of facts and circumstances grounded in reasonably trustworthy information sufficient to warrant a belief by a prudent person that an offense has been or is being committed by the person to be arrested." United States v. Oropesa, 316 F.3d 762, 768 (8th Cir. 2003) (quoting United States v. Hartje, 251 F.3d 771, 775 (8th Cir. 2001); accord United States v. Travis, 993 F.2d 1316, 1323 (8th Cir.), cert. denied, 510 U.S. 883 (1993) (citing Beck v. Ohio, 379 U.S. 89, 91 (1964)). Here, the detectives had information from a reliable confidential informant, which they corroborated through their own surveillance, followed by their observation of what appeared to be a hand-to-hand transaction, which together, provided ample probable cause. United States v. Powell, 39 F.3d 894, 895-96 (8th Cir. 1994) (information from reliable source, corroborated by observation of unusual pedestrian activity consistent with drug sales, sufficient for probable cause to arrest); United States v. Sherrill, 27 F.3d 344, 346 (8th Cir. 1994) (same). Even if the detectives did not have probable cause to arrest Defendant at the moment that they first approached, they clearly gained probable cause once they observed

Defendant discarding items into the car and onto the ground which they recognized as crack cocaine.  United States v. Rivera, 370 F.3d 730, 733 (8th Cir. 2004) (probable cause where defendant appeared to be providing surveillance for another individual officers had cause to believe was engaged in narcotics transactions).

### B.  **Search of Defendant**

After placing Defendant under arrest, the officers were entitled to search Defendant incident to his arrest.  See New York v. Belton, 453 U.S. 454, 458-59 (1981); United States v. Robinson, 414 U.S. 218, 224 (1973);  United States v. Pratt, 355 F.3d 1119, 1121, 1124 (8th Cir. 2004).  As such, neither the drugs nor any other items located on Defendant's person are subject to suppression.

### C.  **Search of Defendant's Car**

After arresting Defendant, the detectives were permitted to search the vehicle incident to the arrest of the driver.  Belton, 453 U.S. at 460.  This is so, even though the initial encounter of Defendant occurred outside the vehicle.  Thornton v. United States, 541 U.S. 615, 124 S.Ct. 2127, 2132 (2004); United States v. Poggemiller, 375 F.3d 686, 688 (8th Cir. 2004), cert. denied, 544 U.S. 911.

Moreover, based on the information provided by the CI, who had proven reliable in the past, their corroboration of that information, and their observation that Defendant had thrown what appeared to be crack cocaine into the car, the officers had probable cause to believe that the car contained contraband.  They were therefore justified in seizing the car and conducting a warrantless search.  United States v. Ross, 456 U.S. 798,

804-09 (1982); <u>Chambers v. Maroney</u>, 399 U.S. 42, 44, 52 (1970).

### D.  <u>Statements Made by Defendant</u>

Following Defendant's arrest, he made three oral statements to Det. Kitchell.  The first statement, to the effect that the detectives could not put the drugs on him, was made immediately upon Defendant's arrest.  Although Defendant was in custody and had not yet been advised of his rights, the statement is still admissible, as it was not the result of interrogation.  <u>Rhode Island v. Innis</u>, 446 U.S. 291, 300-01 (1980).  Advising defendant that he is under arrest and of the basis for that arrest is not the functional equivalent of interrogation, and is not designed to elicit a response.  <u>See</u> <u>United States v. Chipps</u>, 410 F.3d 438, 445 (8th Cir. 2005); <u>United States v. Lockett</u>, 393 F.3d 834, 838 (8th Cir. 2005).

Defendant's other statements were made after he was advised of his rights.  A defendant may knowingly and intelligently waive his rights and agree to answer questions.  <u>Miranda v. Arizona</u>, 384 U.S. 436, 479 (1966).  When the prosecution seeks to introduce in evidence a statement made by a defendant while in custody, it has the burden of showing by a preponderance of the evidence that the statement was made after a voluntary, knowing, and intelligent waiver of <u>Miranda</u> rights by the defendant.  <u>Colorado v. Connelly</u>, 479 U.S. 157 (1986).  The court must examine the totality of the circumstances surrounding the interrogation to determine whether the waiver was the product of a free and deliberate choice, rather than intimidation, coercion, or deception, and whether the waiver was made with an awareness of the right being abandoned and

the consequences of the decision to abandon it.  <u>Moran v. Burbine</u>, 475 U.S. 412 (1986).

The statement must be voluntary and not the product of any police conduct by which the

defendant's will is overborne.  <u>Connelly</u>, 479 U.S. at 170;  <u>Haynes v. Washington</u>, 373

U.S. 503 (1963).  "The requirement that <u>Miranda</u> warnings be given does not, of course,

dispense with the voluntariness inquiry."  <u>Dickerson v. United States</u>, 530 U.S. 428, 444

(2000).  As the Supreme Court has recognized, however, "[c]ases in which a defendant

can make a colorable argument that a self-incriminating statement was 'compelled'

despite the fact that law enforcement authorities adhered to the dictates of <u>Miranda</u>, are

rare."  <u>Berkemer v. McCarty</u>, 468 U.S. 420, 433 n.20 (1984).  <u>See</u> <u>Dickerson</u>, 530 U.S. at

444.

Prior to making his other statements, Defendant was orally advised of his <u>Miranda</u>

rights.  Defendant is a 27-year-old adult who has had prior experience with law

enforcement.  At the time he was advised of his rights, he did not appear to be under the

influence of any drugs or alcohol, or impaired in any other manner.  Nor were any

promises or threats made to induce Defendant's waiver or his oral statements.  As such,

based on the totality of the circumstances, the Court finds Defendant knowingly and

voluntarily waived his rights and made two voluntary oral statements.  Moreover,

Defendant's statement in the car, to the effect that he did not live on Itaska, is admissible

on the further ground that it was not the result of interrogation.

## E.  Search of Itaska Residence

On these facts, it is not at all clear that Defendant possesses a sufficient privacy interest to challenge the search of the Itaska residence.  A defendant moving to suppress evidence has the burden to show that he has a legitimate expectation of privacy in the area or object searched.  United States v. Pierson, 219 F.3d 803, 806 (8th Cir. 2000); United States v. Gomez, 16 F.3d 254, 256 (8th Cir. 1994).

> "Factors relevant to the determination of standing include:  ownership, possession and/or control of the area searched or item seized; historical use of the property or item; ability to regulate access; the totality of the circumstances surrounding the search; the existence or nonexistence of a subjective anticipation of privacy; and the objective reasonableness of the expectation of privacy considering the specific facts of the case."

Id.  Elsewhere, the Eighth Circuit has described the analysis as a two-part test that requires the defendant to show both (1) a subjective expectation of privacy and (2) that the expectation is objectively reasonable, or "one that society is willing to accept." United States v. McCaster, 193 F.3d 930, 933 (8th Cir. 1999).  See also, United States v. Stallings, 28 F.3d 58, 60 (8th Cir. 1994).  Among the facts relevant to the showing are "whether the party has a possessory interest in the things seized or the place searched; whether the party can exclude others from that place; whether the party took precautions to maintain the privacy; and whether the party had a key to the premises."  McCaster, 193 F.3d at 933.

Following his arrest, Defendant advised the detectives that he lived on Arlington, not Itaska.  As defense counsel noted at the hearing, Defendant provided an Arlington

address at his initial appearance, and defense counsel appeared to take the position at the suppression hearing that Defendant lived on Arlington and not Itaska.[4]  If Defendant's assertions are correct, he would not have a sufficient privacy interest to challenge the search at Itaska.  McCaster, 193 F.3d at 933.

Assuming for purposes of the hearing that Defendant did live at the apartment on Itaska, or stay there frequently enough to have a privacy interest, the detectives were authorized to search the apartment based on Ms. Williams' oral and written consent.

It is the prosecution's burden to prove by a preponderance of the evidence that a consent to search was freely given.  United States v. White, 81 F.3d 775, 780 (8th Cir.) cert. denied, 519 U.S. 1011 (1996); United States v. Miller, 20 F.3d 926, 930 (8th Cir. 1994).  A consent is voluntary if it is the product of free choice, the defendant's will is not overborne, and the consent is not given under coercion or duress.  In determining whether the prosecution has met its burden, courts look to both the characteristics of the accused and the details of the environment in which the consent was given.  United States v. Chaidez, 906 F.2d 377, 381 (8th Cir. 1990). Voluntariness is a fact question to be determined from the totality of the circumstances present.  Schneckloth, 412 U.S. at 226-227; United States v. Matlock, 415 U.S. 164 (1974).  The factors to be considered in determining whether consent is voluntary include:

---

[4]  Although the Court does not find her hearsay testimony credible, Mr. Hinton also testified that Ms. Williams told him that when first advised that the officers wanted to search her apartment, she protested that defendant lived on Arlington and did not live with her.

(1) the defendant's age; (2) the defendant's general intelligence and education; (3) whether the defendant was under the influence of drugs or alcohol; (4) whether the defendant was informed of his Miranda rights prior to the consent; and (5) whether the defendant had experienced prior arrests so that he was aware of the protections the legal system affords to suspected criminals.

United States v. Alcantar, 271 F.3d 731, 737 (8th Cir. 2001), cert. denied, 535 U.S. 964 (2002). See United States v. Hathcock, 103 F.3d 715, 719-20 (8th Cir. 1997); Chaidez, 906 F.2d at 381. Among the factors to be considered in examining the environment surrounding the consent, courts examine: the length of time a person is detained and questioned; whether the person was threatened, physically intimidated, or punished by the police; whether the defendant relied upon promises or misrepresentations made by the police; whether the defendant was in custody; whether the consent occurred in a public or secluded location; and whether the defendant objected to the search or stood silently by while the search occurred. United States v. Smith, 260 F.3d 922, 924 (8th Cir. 2001); Chaidez, 906 F.2d at 381. The foregoing factors are not to be applied mechanically, and no single factor is dispositive. Schneckloth, 412 U.S. at 226-27; Chaidez, 906 F.2d at 381.

At the time of these events, Ms. Williams was an adult and the parent of her own children. She did not appear to be under the influence of drugs or alcohol and appeared to understand what was going on. She had also been advised of her rights under Miranda prior to requesting consent to search, and was then advised of her rights and of her right to refuse to consent in the written consent to search signed by her. And while she was

under arrest at the time consent was requested, there were only two officers at the scene, neither of the officers had displayed their firearms, and no threats or promises were made. Moreover, during the course of the search, she voluntarily showed the officers how to open the bedroom door with a butter knife, and at no time voiced any objections to the search.  Under all of these facts and circumstances, the Court finds that Ms. Williams' consent to search was in fact voluntary.

Defendant has not asserted that Ms. Williams in any way lacked authority to consent, and on this record there is no reason to believe she lacked such authority.  Nor has Defendant asserted that he had a superior interest in the premises.  The Supreme Court has recently held that officers may not rely on the consent to search of one occupant when a second occupant is present and expressly objects to the search.  <u>Georgia v. Randolph</u>, 547 U.S. ___, 126 S.Ct. 1515, 1526 (2006).  But that is not the case here. On this record it is clear that Defendant, who was aware of the search and present while much of the search was conducted, neither challenged Ms. Williams' authority to consent to the search nor voiced any objections to the search.  To the contrary, Defendant had taken the position that he did not live there, and apparently still takes that position.  As such, there is no basis to suppress the cash, crack cocaine, papers, and other items seized at the Itaska residence.

Accordingly,

**IT IS HEREBY RECOMMENDED** that Defendant's Motion to Suppress Evidence and Statements (Doc. No. 21) be **denied**.

Trial in this matter has been set for **Monday, July 17, 2006, at 9:30 a.m.**, before the **Honorable Henry E. Autrey**.

The parties are advised that they have eleven (11) days, to and including **June 12, 2006**, in which to file written objections to this report and recommendation pursuant to 28 U.S.C. §636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact.  See Thompson v. Nix, 897 F.2d 356 (8th Cir.1990).


_Audrey G. Fleissig_
AUDREY G. FLEISSIG
United States Magistrate Judge

Dated this 1st day of June, 2006.